PAUL J. AND AMELIA BATASTINI, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Batastini v. Commissioner
Docket Nos. 30256-84; 30262-84; 30332-84; 30333-84; 38659-84.
United States Tax Court
T.C. Memo 1987-378; 1987 Tax Ct. Memo LEXIS 378; 53 T.C.M. (CCH) 1500; T.C.M. (RIA) 87378; July 30, 1987. Robert H. Williams and Arthur A. Dipadova, for the petitioners. Eugene J. Wien, Theodore Marasciulo and Carl Zeswit, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: These cases were consolidated for purposes of trial, briefing and opinion. Respondent determined deficiencies in petitioners' Federal income tax as follows: Docket
Tax
Residence When
Petitioners
Number
Years
Deficiency
Petition Filed
Paul J. and
30256-84
1979
$ 8,527
Cherry Hill,
Amelia Batastini
New Jersey
Joel and Vivienne
30262-84
1978
15,608
Watchung,
Brotman
1,162
New Jersey
Andrew G. and
30332-84
1977
14,919
Hammonton,
Dorothy Berenato
1978
965
New Jersey
Lawrence and Bonnie
30333-84
1977
4,950
Haddonfield,
Legnola
30333-84
1978
777
New Jersey
1979
1,150
Richard Adamucci
38659-84
1977
41,037
Hammonton,
1978
52,507
New Jersey
*380 Each of the petitions includes, among other issues, the common issue of the tax consequences of petitioners' investment in a school bus leasing activity. In the statutory notice, respondent disallowed, in all cases, the depreciation, operating expenses and investment tax credits [2] petitioners claimed on their income tax returns as a result of this investment. [3] The issues for our consideration are: (1) Whether the school bus leasing activity engaged in by petitioners lacked economic substance, and accordingly, should be disregarded for Federal tax purposes. (2) If issue (1) is answered in the negative, (i) whether petitioners engaged in the bus leasing activity for profit and are entitled to the deductions and tax credits claimed with respect to that activity; (ii) whether there is a distortion of the petitioners' income as a result of the mismatching of deductions and income; (iii) if petitioners are *381 entitled to claim investment tax credits, whether they are entitled to the maximum credit for the first taxable year. (3) Whether petitioners are liable for additional interest under section 6621(c). [4]
FINDINGS OF FACT The parties submitted a first, second and third stipulation of facts each of which was accompanied with attached exhibits. The stipulations of facts and attached exhibits are incorporated herein by this reference. Petitioners became familiar with and invested in the subject sale and leaseback transactions through their common business or personal connection with Bryen & Bryen, P.A. [5] Bryen & Bryen, P.A., was owned equally by Fred Bryen (Fred) and his son, Bruce Bryen (Bruce). [6] Fred was a full-time accounting *382 professor (from 1965 through 1978) at Rutgers University and a consultant to Bryen & Bryen, P.A., during the years in issue. As of the date of trial he had been a certified public accountant for approximately 35 years during which time he worked for Bryen & Bryen, P.A., and its predecessor. Bruce, a certified public accountant for 12 years up through the time of trial, worked as an accountant with Bryen & Bryen, P.A. and its predecessor for 17 years. Throughout their practice, Fred and Bruce developed and maintained the confidence and trust of their accounting/management clientele. During the years in question, Bruce was in the forefront of client relations for both Bryen & Bryen, P.A., and Bryen, Bryen and Company (Bryen Co.). Each of the petitioner/investors in these cases had *383 little or no knowledge of the sale-leaseback transaction. Each of them merely put up his money and left all the business arrangements to the promoter/tax advisors. They placed their trust in Bruce and Fred to handle all aspects of the transaction for them. Sometime during the spring of 1976, Bruce, through a client, became aware of the possible sale of Pat and Gordon, Inc., a New Jersey corporation (Old Pat and Gordon). Old Pat and Gordon was a school bus company in the business of transporting school children to and from school. [7] As part of his plan to purchase this company, Bruce asked Fred to structure a tax shelter plan through which Old Pat and Gordon could be purchased, followed by a sale-leasebck of the buses. The sale-leaseback plan, structured and managed by Fred and promoted and engineered by Bruce, is the series of transactions that have given rise to the issues presently before us. For reasons which neither *384 party has seen fit or has been able to adequately explain, the series of transactions and the cast of entities and characters utilized to accomplish the desired ends were unusually complex and convoluted. The following diagram and summary is provided as a guide to following and understanding the factual findings of this case: [SEE ILLUSTRATION IN ORIGINAL] (1) Pat and Gordon, Inc. (Old Pat and Gordon), sells its tangible assets to Patgo, Inc., for $ 259,500 (2) Pat and Gordon, Inc. (Old Pat and Gordon), sells its intangibles, including its name, to 5 Allison Drive, Inc., for $ 70,000 (3) 5 Allison Drive, Inc., assumes the name of Pat and Gordon, Inc. (New Pat and Gordon) (4) Patgo, Inc., sells the tangible assets to Patgo Associates for the sum of $ 628,200 (5) Patgo Associates sells the tangible assets to individual investors for the sum of $ 628,200 (6) Individual investors enter into a management contract with Bryen, Bryen & Co. for the management of the tangible assets (7) Individual investors, through the management contract with Bryen, Bryen & Co., lease all the tangible assets back to Patgo Associates (8) Patgo Associates enters into management contract with *385 Bryen, Bryen & Co. for the management of the tangible assets (9) Patgo Associates, through the management contract with Bryen, Bryen & Co., subleases all the tangible assets to New Pat and Gordon, Inc. Details of the Transactions
On February 11, 1977, Old Pat and Gordon, Inc., agreed to sell to Patgo, Inc., a New Jersey corporation, [8] all its existing tangible assets and real property for the sum of $ 259,500. [9] The assets and real property consisted of 77 school buses, four service vehicles, land and buildings located at 270 Gloucester Pike, Lawnside, New Jersey, and some miscellaneous equipment. On February 11, 1977, it was further agreed that Old Pat and Gordon would sell to 5 Allison Drive, Inc., a New Jersey corporation, [10] for the sum of $ 70,000 the right to use the name Pat and Gordon, Inc., and the right to Old Pat and Gordon's Public Utility Commission (P.U.C.) licenses to transport school children. As part of these agreements Old Pat and Gordon entered into a covenant not to compete to which $ 10,000 of the $ 70,000 was allocated. [11] Settlement of the February 11, 1977, contracts was reached on or about March 9, 1977, at which time title to all the tangible *386 and intangible property passed to the respective corporate buyers. On March 10, 1977, 5 Allison Drive, Inc., assumed the name of Pat and Gordon (New Pat and Gordon) and has at all times thereafter operated under that name. [12]
*387 Simultaneous with Patgo, Inc.'s purchase of the tangible assets, and in the absence of a written sales agreement, Patgo, Inc., "sold" these assets to Patgo Associates (a new partnership) for the sum of $ 628,200. In payment of the "purchase price Patgo Associates executed a five-year, ten-percent note, payable in equal annual installments of $ 165,720 due on Decembber 31 of each year, beginning in 1977. Nothing in the record supports the increased value Patgo, Inc., assigned to the tangible assets. Moreover, there is no deed or title document in the record that shows or reflects the transfer of the real property located in Lawnside, New Jersey (Lawnside real property), from Patgo, Inc., to Patgo Associates. On March 8, 1977, Patgo, Inc., acting as the owner of the Lawnside real property, executed a $ 500,000 mortgage on the property in favor of Guarantee Bank. [13] This transaction was recorded by the Register of Deeds, Camden County, New Jersey. *388 Concurrent with Patgo Associates' purported pruchase of the tangible assets from Patgo, Inc., Patgo Associates purportedly sold the buses and real property to petitioners and other investors for total consideration of $ 628,200. [14] The value assigned to the tangible assets under the Old Pat and Gordon-Patgo, Inc., contract was $ 155,298. Bruce introduced each of the petitioners involved herein to this sale-leaseback activity. In each instance Bruce and/or Fred has served for many years as the accountant and financial advisor to all the petitioners. The specific property purchased and the amount of money invested by an investor depended, in large part, upon his tax needs as determined by Bruce. [15] The property acquired, as well as the price of each item purchased, was determined by Fred, as the representative of Bryen, Bryen & Company (Bryen Co.), without any input, inquiry or negotiation by the investor. Each petitioner invested in the activity without receiving a written *389 prospectus or detailed report setting forth how the activity would operate and how they would make the profits that Bruce represented were possible. [16] None of the petitioners had prior experience in buying and leasing school buses. They invested in the activity without consulting any other accountant, financial advisor or attorney to review the transaction. Petitioners did not inspect the buses or request that the buses be inspected on their behalf. Petitioners did not receive reports or information on the performance of the leasing activity (except for the Schedule C provided by Bruce or Fred and attached to their income tax returns) [17] and they did not inquire about the operation of the buses or the activity as a whole. Up to the trial date, petitioners had not received or sought to obtain the titles for the buses. *390 Under the sale-leaseback plan each investor was required to pay by means of an installment note and cash. Pursuant to the plan each investor executed a seven-year, ten-percent note representing the total purchase price for the property. [18] Petitioners did not personally make any payments on these notes and they did not anticipate having to make such payments. The petitioners did not inquire about whether the payments were being made, and in those cases where the notes were paid off, petitioners were unaware of the cancellation of their notes. In addition to the note, each investor was required to pay to Bryen Co. an amount of cash approximating 50 percent of his purchase price as payment of the first year's anticipated expenses attributable to the operation of the investor's property. These funds, however, were not used for this purpose; rather, they were used to make interest-free loans to Patgo, Inc., New Pat and Gordon, and Patgo Associates without notification to or the approval of the investors. Each investor was also required to pay Bryen & Bryen, P.A., a ten-percent commission (based upon the purchase price) for finding the investment. The commissions were the only fees *391 Fred and Bruce received from the transaction. The amount paid towards the first year's operating expenses plus the ten-percent commission represented the investor's total out-of-pocket cost for his entire investment. Fred structured the deal in such a way that petitioners would not have to pay any additional cash, not even in later years, but a single investor could claim deductions totaling as much as $ 338,649 over the two taxable years in issue. [19]
Petitioners, simultaneous with the execution of a purchase agreement for the buses and other property, entered into an agreement authorizing the Bryen Co. [20] (investor-Bryen Co. management agreement) to manage the property. Bryen Co. was not entitled to any compensation for the *392 management services it performed under this agreement. Pursuant to this agreement Bryen Co., on the behalf of each petitioner, entered into a three-year lease with Patgo Associates (investor-Patgo Associates lease), thereby leasing to Patgo Associates the property allegedly purchased by the investors (mainly buses). The leases were to be renewed yearly thereafter. [21] The investor-Bryen Co. management agreement also required Bryen Co. to maintain appropriate records of all activities pertinent to each investor's involvement, and to submit to such investor an annual statement of total cash receipts and disbursements attributable to his investment. Bryen Co. failed, with regard to all petitioners in this consolidated group of cases, to provide annual statements and none of the petitioners have made any effort to enforce this requirement. *393 Simultaneous with the execution of the investor-Bryen Co. management agreement Patgo Associates entered into a management agreement with Bryen Co. [22] (Patgo Associates-Bryen Co. management agreement), which authorized Bryen Co. to manage all aspects of Patgo's business including but not limited to: (1) having sole power to handle receipts and distributions; (2) borrowing and investing funds on its behalf; (3) providing all necessary bookkeeping and accounting services; (4) hiring and firing personnel; and (5) retaining experts in law, tax, accounting, real estate and others as necessary at the sole expense of Patgo Associates. The initial term of the agreement was one year, to be automatically renewed yearly unless terminated as agreed between the parties. Pursuant to this agreement Bryen Co. entered into a sublease with New Pat and Gordon (Patgo Associates-New Pat and Gordon lease) leasing to New Pat and Gordon the buses purportedly leased to Patgo Associates under the investor-Bryen Co. agreement. [23] The terms of the sublease were substantially the same as the leases between the investors and Patgo Associates except for a five-percent override payable to Patgo Associates. *394 The length of each lease negotiated under the investor-Patgo Associates agreement and that of the Patgo Associates-New Pat and Gordon lease, as well as the amount of rents to be charged, were negotiated by Bryen Co. without any negotiation or inquiries from the investors or Patgo Associates. [24] All investor-Patgo Associates leases were negotiated for a three-year term and were purportedly renewed, on the same terms and conditions, by Bryen Co. for three or four successive one-year periods. At the expiration of this period the leases were to be renewed, by a document captioned "Addendum to Lease Agreement," for an additional three, four or five-year term. In many cases the total life of a lease would extend beyond the useful life of the bus being leased, thereby resulting *395 in the collection of "rent" on buses that had been retired. The rental payments due under each investor-Patgo Associates lease were structured by Fred to be applied first towards the annual payments due on the investors' notes and second towards the expenses incurred in the operation of the buses. Also, the rental payments were structured to give the investors the benefit of deducting the operating expenses in one year and reporting the matching rental income in the following year; in all cases the rental payments were due January 2, beginning the year after the initial lease year. Additionally, each investor's account was credited with a full year's rental income regardless of which part of the year the investor entered into a lease with Patgo Associates. *396 At the time Fred structured the sale-leaseback transaction New Jersey law allowed P.U.C. designated buses, [25] which could be used for transporting adults only on unscheduled intrastate charter trips, to be used for 20 years; [26] non-P.U.C. designated buses used for transporting school children and manufactured prior to April 11, 1977, could be used for ten years from the date of manufacture. Effective July 1, 1983, the New Jersey law was changed to permit any non-P.U.C. school bus manufactured after April 1, 1977, to be used up to the later of the end of the twelfth year from the date of manufacture or to the end of the school year in which that date fell. The policy of New Pat and Gordon, upon the expiration of the statutory useful lives of the non-P.U.C. buses, was either to keep the buses for spare parts or sell them. Investors did not receive any of the sale proceeds from the buses that were sold as scrap neither were they given compensation for or notified of parts taken from the buses. *397 Each investor was treated as a separate business entity and attached a Schedule C to his tax return reflecting the alleged leasing activity. Batastini's Investment
Petitioner Batastini [27] "invested" a total of $ 11,000 in the sale-leaseback activity and for taxable year 1979, the only year in issue, claimed deductions totaling $ 18,325. On August 24, 1979, petitioner executed a "Sales Contract" [28] through which he was to purchase two 1979 Chevrolet buses for a total purchase price of $ 18,517. The full purchase price was paid by a seven-year, ten-percent note, the terms of which required petitioner to make seven equal annual payments of $ 3,803.49 due on December 31, beginning in 1979. *398 Concurrent with the execution of the "Sales Contract" an investor-Patgo Associates' three-year lease was executed by Bryen & Bryen, P.A., [29] on petitioner's behalf. Under the terms of this lease Batastini was to receive total rents of $ 38,886 payable in three equal annual installments of $ 12,962. This lease was to be renewed on the same terms and conditions for two successive one-year periods. [30] By a document captioned "Addendum to Lease Agreement," dated March 1, 1983, this lease was to be renewed for an additional five-year term, commencing on August 24, 1984. Total rents to be paid under the five-year lease were $ 45,335, payable in equal annual installments of $ 9,067. Brotman's Investment
Petitioner Brotman [31] "invested" a total of $ 25,000 in the activity [32] and for taxable years 1978 and 1979 claimed deductions totaling $ 80,654 and $ 36,356, respectively. *399 By a "Sales Contract" dated June 14, 1978, Brotman was to purchase on 1977 Ford bus (54 seater) and three 1977 Dodge vans (16 seater) for a total of $ 46,350. The full purchase price was paid by a seven-year, ten-percent note, the terms of which required petitioner to make seven equal annual payments of $ 9,520.75, the first being due on December 31, 1978. Concurrent with the execution of the "Sales Contract" an investor-Patgo Associates three-year lease was executed by Bryen & Bryen, P.A., on petitioner's behalf. Under the terms of this lease petitioner was to receive total rents of $ 111,240, payable in three equal annual installments of $ 37,080. This lease was to be renewed on the same *400 terms and conditions for three successive one-year periods. On March 1, 1983, Bryen & Bryen, P.A., was to renew this lease for an additional four-year term, commencing on June 14, 1984. Rents to be received under the four-year lease totaled $ 83,228, payable in equal annual installments of $ 20,807. Berenato's Investment
Petitioner Berenato [33] "invested" total cash of $ 13,775.52 in the activity and for taxable years 1977 and 1978 claimed total deductions of $ 28,447 and $ 20,648, respectively. [34]
By a "Sales Contract" dated January 3, 1977, [35] petitioner was to purchase one 1976 International bus (54 seater) and one 1975 Ford bus (54 seater) for a total purchase price of $ 25,000. Petitioner executed a seven-year, ten-percent note for the full purchase price, the *401 terms of which required petitioner to make seven equal annual payments of $ 5,134, with the first payment due December 31, 1977. An investor-Patgo Associates lease, dated January 3, 1977, was executed by Bryen & Bryen, P.A., on petitioner's behalf. Under the terms of this lease petitioner was to receive total rents of $ 60,000, payable in three equal annual installments of $ 20,000. This lease was to be renewed on the same terms and conditions for four successive one-year periods. By a document captioned "Addendum to Lease Agreement," [36] dated March 1, 1983, Bryen & Bryen, P.A., was to renew the lease for an additional three-year term, [37] commencing on January 3, 1984, for a total rent of $ 30,000 payable in equal annual installments of $ 10,000. *402 Legnola's Investment
Petitioner Legnola, [38] invested total cash of $ 28,701 in the sale-leaseback activity and for the taxable years in issue claimed the following total deductions: 1977 - $ 39,425; 1978 - $ 33,727; and 1979 - $ 31,833. By a "Sales Contract" dated January 3, 1977, [39] petitioner was to purchase two 1975 Ford buses (54 seater), one International bus (54 seater), and one 1976 Ford van (12 seater) for $ 40,500. Petitioner paid this amount by executing a seven-year, ten-percent note which required him to make seven equal annual payments of $ 8,316, the first of which was due December 31, 1977. An investor-Patgo Associates lease, dated January 3, 1977, was executed by Bryen & Bryen, P.A., on petitioner's behalf. Under the terms of this lease petitioner *403 was to receive total rents of $ 45,562.50, payable in three equal annual installments of $ 8,316. [40] This lease was to be renewed on the same terms and conditions for four successive one-year periods. On March 1, 1983, by a document captioned "Addendum to Lease Agreement," [41] Bryen & Bryen, P.A., was to renew the lease for an additional three-year term, [42] commencing on January 3, 1984, for total rents of $ 48,600, payable in equal annual installments of $ 16,200. *404 Adamucci's Investment
Petitioner Adamucci [43] invested total cash of $ 107,105.81 in the sale-leaseback activity and claimed total deductions of $ 168,375 and $ 170,274 for taxable years 1977 and 1978, respectively. By a "Sales Contract" dated January 3, 1977, [44] Adamucci was to purchase the following vehicles: two 1972 Ford buses (54 seater), three 1972 Ford buses (42 seater), one 1973 International bus (43 seater), two 1973 International buses (44 seater), two 1973 Ford buses (12 seater), three 1974 Ford buses (40 seater), one 1974 Chevrolet bus (16 seater), one 1974 Ford bus (12 seater), and two 1976 International buses (44 seater) for a total purchase price of $ 136,000. Petitioner executed a seven-year, ten-percent note for the full purchase price. Under the terms of the note petitioner was required to make seven equal annual payments of $ 27,936, the first of which was due on December 31, 1977. *405 Petitioner, by another "Sales Contract" dated April 1, 1977, was to purchase five International buses (54 seater) for $ 63,455. This amount was also paid with a seven-year, ten-percent note, payable in seven equal annual installments of $ 13,034, the first of which was due December 31, 1977. An investor-Patgo Associates lease was entered into by Bryen & Bryen, P.A., on petitioner's behalf, for a three-year term with respect to the buses purportedly acquired on January 3, 1977. Under the terms of this lease petitioner was to receive total rents of $ 326,400, payable in three equal installments of $ 108,800. This lease was to be renewed on the same terms and conditions for four successive one-year periods. By a document captioned "Addendum to Lease Agreement" dated March 1, 1983, Bryen & Bryen, P.A., was to renew this lease for an additional three-year term commencing on January 3, 1984. Under this lease petitioner was to receive total rents of $ 163,200, to be paid in equal annual installments of $ 54,400. A second investor-Patgo Associates lease was entered into, on petitioner's behalf, for the *406 buses covered by the April 1, 1977, "Sales Contract." Under the terms of this lease petitioner was to receive total rents of $ 152,292, payable in three equal installments of $ 50,764. This lease was to be renewed on the same terms and conditions for four successive one-year periods. By a document captioned "Addendum to Lease Arrangement" this lease was to be renewed for an additional three-year term [45] commencing on April 1, 1984, for total rent of $ 76,146, payable in equal annual installments of $ 25,382. Additional Details of the Transactions
In all instances the rents due under the investor-Patgo Associates leases were not payable until the second day of January following the end of the leased year. Patgo Associates, by an unacknowledged and unrecorded deed executed by Fred and dated January 3, 1977, purportedly transferred the Lawnside real property to Theresa Adamucci [46] (Theresa) for the sum of $ 140,300. At the time *407 of this alleged purchase Theresa also was to purchase the equipment for $ 25,000. An installment note was executed on Theresa's behalf [47] for the full purchase price of both the Lawnside real property and the equipment. Nothing in the record supports the increase in price Fred assigned to the Lawnside property and the equipment. Fred, acting on the behalf of both the bus investors and Theresa, purportedly entered into an oral agreement to lease, from Theresa, the garage located on the Lawnside real property at an annual rental of $ 73,689. [48] This rent was accrued on the books of New Pat and Gordon and charged to the investors' account, thus enabling the investors to claim a rental expense. No rental income, however, was ever paid to Theresa. [49]
*408 Financial and Accounting Activity
Each year on or about December 26, Bryen Co. would obtain a loan from Kennedy Mortgage Company (Kennedy Co.) in an amount which approximately equaled both the aggregate rents due under the investor-Patgo Associates leases and the rent for the Lawnside real property. [50] Upon receipt of these funds Bryen Co. would reimburse New Pat and Gordon for all maintenance expenses and garage rent accrued for that year; [51] the remaining funds were applied against the aggregate payments due on petitioners' installment notes. [52] This pattern of borrowing was devised by Fred to enable the petitioners to claim deductions in the year the operating expenses, interest and rents were paid while deferring the inclusion of the related income for one year. Under the lease agreements, rents were not due until January 2 of the year following the lease term. In all cases petitioners claimed an interest expense for the entire year regardless of the date on which the installment note was executed. *409 On or about the second or third day of January in the year subsequent to the "loan year," Bryen Co. purportedly collected all rents due under the investor-Patgo Associates leases. Upon the "receipt" of the rental income, Bryen Co. would "repay" the outstanding Kennedy Co. loan plus any interest charged. The payment to Kennedy Co. completed the circle intended for the borrowed funds. Both Fred and Bruce were financial consultants to, and held a significant interest in, Kennedy Co. The other shareholders were either related to Bruce and Fred or had acquired their interest in the company as a result of a bank loan arranged by Bruce. [53] Fred negotiated all the loans obtained from Kennedy Co. solely on the strength of the Bryen Co.-Kennedy Co. connection; Fred never disclosed that he was borrowing the funds on the investors' behalf. The loans Fred obtained from Kennedy Co. ranged in amounts from $ 513,533 to $ 759,297 and were made without requiring Fred to go through the formal application process or to provide some form of collateral. Kennedy Co., with the exception of one year, did not charge any interest on these loans. [54]
*410 Fred determined, unilaterally, total operating expenses and the allocation of same among the investors. The operating expenses included insurance, tires and tubes, fuel and lubrication, repair parts, repair labor, garage rent, tags and licenses, and supervision. [55] These expenses often included expenses charged for buses no longer in operation and Fred charged the same amount of expenses to newer buses as he did to older buses which may have required more maintenance. Fred accrued the operating expenses on the books of New Pat and Gordon and allocated them to the petitioners according to the percentage each petitioner's purchase price bore to the total cost of the entire bus fleet. Petitioners deducted, on their Federal income tax returns, the expenses attributable to the maintenance and operation of "their" buses as well as a proportionate share of the rental expense attributable to the Lawnside real property. Additionally, some petitioners claimed the investment tax credit. Respondent disallowed all the claimed deductions and the investment tax credits. *411 Ultimate Findings
In 1976 and 1977, Fred and/or Bruce, along with other associates, some of whom are petitioners herein, intended to buy a school bus business from Poponi. The business was purchased by this group (partners or shareholders of 5 Allison Drive, Inc., Patgo, Inc., New Pat and Gordon and Patgo Associates) [56] for the following consideration: (1) $ 259,500 for the buses, land and some miscellaneous personalty; (2) $ 70,000 for the trade name, licenses and goodwill; (3) $ 295,000, plus 5 percent of annual gross sales over $ 893,000 over five years, which amounts were characterized as fees and commissions, respectively. [57] As part of financing his purchase plan, Bruce interested some of Bryen Co.'s clients in a loosely structured investment opportunity where they would receive a two-for-one return on any money they put into the deal. [58] Using many entities and few constraints, Fred and Bruce "wheeled and dealed" regarding all aspects of the transaction including rents, deductions, leases, agreements, buses, realty, somewhat fabricated deductions, and investment tax credits throughout the course of the taxable years in issue. [59] None of petitioners exhibited any *412 genuine business interest in the investment, its terms, the underlying assets or any other normal aspects of the business deal which are usually considered by potential investors. Petitioners essentially entrusted their money to Fred and Bruce to be used to generate tax benefits. The purported sale-leaseback transaction in which petitioners participated lacks economic substance and is thus not to be recognized for Federal tax purposes. [60]
*413 OPINION Respondent contends that there was no sale of the property by Patgo Associates to petitioners, therefore, petitioners never executed a bona fide sale-leaseback. Additionally, respondent argues that the transaction entered into by petitioners was nothing more than a tax-avoidance scheme devoid of economic substance which should be disregarded for Federal tax purposes. Petitioners, on the other hand, argue that they acquired the property in a valid sale, and subsequently entered into a bona fide leaseback transaction with the intent of making a profit. We agree with respondent. In determining whether the transaction, as a whole, has economic or business substance, we must inquire whether it was entered into with any economic, commercial or legal purpose other than the hoped for tax benefits. See Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1243 (1981). Taxpayers are generally free to structure their business transactions as they please, though motivated *414 by tax reduction purposes. Gregory v. Helvering,293 U.S. 465 (1935); Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 196 (1983), affd. on this issue 752 F.2d 89 (4th Cir. 1985). A transaction, however, entered into without any economic, commercial or legal purpose other than hoped for tax benefits will be disregarded for tax purposes. Frank Lyon Co. v. United States,435 U.S. 561 (1978); Rice's Toyota World, Inc. v. Commissioner, supra, at 196; Grodt & McKay, Inc. v. Commissioner, supra at 1243. We must, therefore, determine whether a threshold level of business purpose or economic substance is present. Braddock Land Co. v. Commissioner,75 T.C. 324 (1980); Hilton v. Commissioner,74 T.C. 305 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982). More specifically, in the sale-leaseback context, a nonuser-owner recipient of tax benefits must prove that his entry into the transaction was motivated by a business purpose sufficient to justify the form of the transaction and that the transaction was supported by economic substance. *415 Rice's Toyota World, Inc. v. Commissioner, supra at 201-203. Petitioners argue that they entered into the sale-leaseback transaction with the intent to make a profit. We find this argument unconvincing and unsupported by the record. The determination of profit-making intent is one of fact to be resolved using all relevant surrounding facts and circumstances; no one factor is determinative. Allen v. Commissioner,72 T.C. 28, 34 (1979). At trial, petitioners could not clearly recall the discussion Bruce had with them with respect to investing in the activity. They were unsure of how long their money would be tied up in the deal and how it would be repaid to them. None of them could outline how the deal would work or why they were paying cash in addition to the note executed for the full purchase price of the property. Petitioner Batastini testified at trial that he invested in the activity mainly because of the tax benefits. We find Batastini's motivation to be representative of all the investors. The record shows no reason, apart from tax considerations, *416 to justify petitioners' participation in this sale-leaseback transaction. Petitioners' failure to focus on the non-tax or business aspects of the transaction is not in itself fatal to petitioners' contention that they entered into the transaction as a bona fide business transaction. If an objective analysis of the transaction indicates that there was a realistic opportunity for an economic profit, the transaction will not be disregarded. Rice's Toyota World, Inc. v. Commissioner, supra at 203. Such an analysis requires us to probe behind the designated labels and view the transaction in the context of the surrounding facts and circumstances. This purported sale and leaseback was conceived as part of an overall plan were Fred, Bruce and other related investors could buy out Old Pat and Gordon using funds from petitioners/investors in exchange for tax benefits New Pat and Gordon could probably not otherwise utilize. In each case petitioner recouped his total cash investment no later than the end of the second year. Petitioners faced no risk of loss in the transaction and in reality did not expect to receive any profits. Fred structured and manipulated the *417 deal to divert any profits that were generated after the completion of the five-year pay-out plan to Poponi from New Pat and Gordon by decreasing the rental payments due petitioners under their leases with Patgo Associates, and then by phasing out petitioners' involvement at the beginning of the "profitable" phase. Petitioners had no control over or knowledge of the important aspects of the transaction and the amount of money needed for the venture was determined by Bruce, solely on the investor's tax needs. Even though the buses were used and had limited useful lives, petitioners did not attempt to negotiate for a lower purchase price or inspect the property. The limited useful life and used condition was not factored into the economics of the transaction, instead similar terms were utilized for all buses no matter how long the remaining term of each individual bus's useful life or condition. The buses were assigned a purchase price triple their fair market value and petitioners were obligated to "pay" this amount if they wanted to be included in the venture. They accepted all terms without question because their principal or sole concern was the potential tax benefits. *418 The rental and lease terms were determined and controlled by Fred, without any input or knowledge by petitioners. In many instances, the lease term exceeded the bus's remaining useful life. Moreover, Fred represented lessor and the lessee and he unilaterally decided the amount of rental payments and when to increase or decrease them. At the end of each year Fred credited the investors' accounts with the amount of rental income he determined was necessary to produce the desired tax benefits. The amount of income due under the lease was not necessarily the amount of income Bryen & Bryen, P.A., included on the investor's income tax return. For example, in the case of petitioner Legnola the lease with Patgo Associates required rental payments of $ 20,000 in 1978 and 1979. However, on their 1978 and 1979 income tax returns they reported gross rents from the leasing activity of $ 32,889 and $ 32,400, respectively. Fred also applied these ad hoc methods to calculate and allocate the operating expenses. Fred annually decided the amount of operating expenses and the allocation to a particular investor's account. The investor's expense allocations bore no relation to the maintenance *419 required for the corresponding buses. Fred's method resulted in excessive expense allocations to newer and understated allocations to older buses. As significant, the operating expenses plus depreciation allocated to an investor always exceeded the rental income due under the investor-Patgo Associates lease. Petitioners, however, have chosen to ignore these facts. They did not see the need to verify the operating expenses of "their" buses or to renegotiate the rental due under the lease. Fred, Bruce and petitioners brought no bus business expertise to these ventures. Despite the lack of knowledge and expertise, petitioners "invested" in the transaction without obtaining a prospectus or other written plan of the proposed bus company operation. Petitioners did not verify the bus business operation, secure titles or request an accounting from Bryen & Bryen, P.A. Numerous other irregular aspects of these transactions support a finding that they lacked any realistic opportunity for economic profit. The transaction, in its entirety, lacked economic, commercial or legal purpose. Fred, relying solely on the strength of Bryen Co., obtained large "loans" from Kennedy Co., a corporation *420 substantially owned by the Bryens, without having to (1) post any collateral; (2) go through the normal loan procedures; or (3) pay any interest on the loans. These funds were then used in a money circle [61] to produce the tax benefits promised to petitioners. Upon completion of this circle the funds were returned to Kennedy Co. Additionally, the management contracts entered into by petitioners with Bryen Co. were performed by Bryen & Bryen, P.A., without notification of assignment to the investors and without their approval. No distinction was made between the functions to be performed by the different contracting corporations; rather the functions were performed as Fred saw fit. Under the investor-Bryen Co. management contract, Bryen Co. would not collect a fee for the ongoing management of the venture. The only payment made to Bryen Co. over the duration of the activity was the commission each investor paid upon acceptance of the plan. Fred represented both parties to the transactions, or in some instances the parties were represented by Bruce and Fred. We find these factors, considered collectively, to be contrary to the formation or operation of a bona fide business venture. *421 The purported sale transaction between Patgo Associates and petitioners/investors is devoid of economic substance and is to be disregarded for Federal tax purposes. Such a transaction is characterized by "the expedient of drawing up papers to characterize transactions contrary to objective economic realities, and which have no economic significance beyond the expected tax benefits." Falsetti v. Commissioner,85 T.C. 332, 347 (1985), see Knetsch v. United States,364 U.S. 361 (1960); Frank Lyon Co. v. United States,435 U.S. 561 (1978). In determining whether a sale transaction is to be disregarded, we must first determine whether the parties have in fact done what the form of their arrangement purports to do. Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237 (1981). *422 In other words, we must determine whether Patgo Associates sold the property to petitioners. The term "sale" is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or a promise to pay money. Commissioner v. Brown,380 U.S. 563, 571 (1965). The main inquiry in determining whether a sale has, in fact, taken place is whether the benefits and burdens of ownership have passed from the seller to the buyer. The factors considered by the courts to be relevant in making this determination are: (1) whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity was acquired in the propriety; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of *423 the property. Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237-1238. Another factor relevant to this inquiry is the presence or absence of arm's-length dealing. Estate of Franklin v. Commissioner,64 T.C. 752 (1975), affd. 544 F.2d 1045 (9th Cir. 1976). These factors must be considered in light of all the facts and circumstances surrounding the transaction. We have done our best to extract all relevant facts and circumstances surrounding this unusually complex and convoluted set of transactions. Petitioners have offered minimum assistance in helping us derive some sense of coherence from this maze of tax shelter activities. They, therefore, must bear the burden of their own perplexing ingenuity. The transfer of the tangible assets from Patgo, Inc., to Patgo Associates was not a valid sale. Despite the voluminous nature of these transactions, there was no written agreement of sale to facilitate the transfer of title in the property to Patgo Associates. Moreover, all the terms and conditions, including the purchase price, were determined by Fred who acted as the representative of seller (Patgo, Inc.) and buyer *424 (Patgo Associates). Additionally, the terms of the "sale" required Patgo Associates, a newly formed partnership, to execute a five-year, ten-percent note for $ 628,200, the purchase price assigned to the assets, even though financially incapable to service the note. The assets could not be used as collateral to secure the note because they were ostensibly worth no more than $ 259,200, the price Patgo, Inc., paid Old Pat and Gordon for them. Nothing in the record supports this same-day increase of $ 368,700 Fred assigned to the purchase price of these assets. Patgo, Inc., nevertheless, accepted the note from Patgo Associates, a partnership owned and controlled, in large part, by the Bryens. Another factor which reveals the true substance of the purported sale transaction is the absence of a deed to evidence the transfer of the Lawnside real property from Patgo, Inc., to Patgo Associates. At all times before and after the purported sale, Patgo, Inc., held, as legal owner, title to this property. On March 8, 1977, Patgo, Inc., obtained from the Guaranteed Bank a $ 500,000 mortgage on the Lawnside real property. More importantly, Patgo Associates exercised no control over the *425 Lawnside real property or the other tangible assets, but served merely as a conduit through which these assets could be passed to the investors at a grossly inflated price. After the purported sale, Patgo, Inc., continued to use the buses as collateral for loans it obtained for itself, Bryen Co., and Patgo Associates, without any notification to or consent from the purported investors, the alleged owners of the buses. The investors, on the other hand, could not encumber or sell the property without the permission of Patgo Associates. These factors lessen any probative value the executed documents may have added to these transactions. We find, therefore, that the transaction between Patgo, Inc., and Patgo Associates was without substance, engineered merely in an attempt to inflate the value of the tangible assets. TWe now address the purported sale transaction between Patgo Associates and petitioners/investors. This transaction was likewise without substance, even though formal documents were executed. Title to the tangible assets never left Patgo, Inc. A document entitled "Bill of Sale," executed by Fred in favor of each investor, purported to transfer ownership of the property *426 being "acquired" to the investor. This purported transfer, however, was contrary to a provision contained in the "Bill of Sale" which provided that Patgo Associates was the lawful owner of the property, and held such property free and clear from all encumbrances. Moreover, each "Sale Contract" executed by an investor provided that title to the vehicles would be held in the name of Patgo, Inc. The purpose for this, as stated in the contract, was to facilitate registration of the vehicles. We do not find this to be probative in view of the fact that Patgo, Inc., Patgo Associates, and the investors have all been unable to explain why it was necessary for the titles to be held by Patgo Associates, and how this would simplify registration of the vehicles. We also afforded significance to the contradictory provisions contained in each investor-Patgo Associates lease. Under the terms of each lease the investor assumed all responsibility, cost, and expense for obtaining all licenses and registering the "acquired" vehicle(s). Each lease also provides that all certificates of title or registration applicable to the "acquired" property shall be applied for, issued and maintained *427 in the investor's name. Despite the investors' agreement to these contradictory terms none of them, up to the date of trial, had seen or inquired about obtaining the titles to "their" buses. We are, therefore, convinced that the titles were held by Patgo, Inc., as the legal owner, and that the registration of the buses was, at all times, the responsibility of Patgo, Inc. Through Fred's manipulation, Patgo, Inc., was the party ultimately responsible for all aspects of operating the buses. The provisions contained in each agreement were written to accomplish a separate part of the transaction. There was no apparent reconciliation between some of the provisions contained in various agreements or documents. This planning technique is responsible, in part, for resulting complexity and somewhat incongruous set of transaction with which we are now confronted. To "purchase" the desired property each petitioner executed a seven-year, ten-percent note for the full purchase price Fred assigned to the property. None of the petitioners, however, ever expected to be called upon to pay the installments due on these notes; rather they relied upon Fred, who arranged the transaction in such *428 a way that the notes were "paid" by other means. As promised, Fred carefully structured the rental payments due under the investor-Patgo Associates leases to cover the operating expenses "sold" to the investors and the annual payments due on the notes. At trial when it was pointed out that some of the notes had been "paid in full" the petitioners were unaware of such cancellation and had no idea how and when the notes were paid. The inflated purchase price Fred assigned to the tangible assets, which was three times the amount paid to Poponi on the behalf of Old Pat and Gordon is another factor that reflects the realties and substance of these transactions. For unexplained reason, the purchase price was increased to $ 628,200 on the same day they had been purchased for $ 259,500. This dramatic and unsupported increase in value, coupled with the investors' willingness to accept the obviously inflated purchase price, casts great doubt on the reality of the sale. Another significant factor is the absence of arm's length bargaining. The entire transaction was put together and controlled by Fred. He determined (1) what corporations and partnerships would be formed to facilitate *429 his sale-leaseback plan; (2) how the property would be channeled through to the investors; (3) all the terms and conditions of any purposed "sale;" (4) what property would be "purchased" by an investor; (5) the required mark up in price that would make the tax benefits worthwhile to the investors; and (6) the terms and conditions of all agreements with respect to the formalities required to get the property back within the confines of Patgo, Inc. Each more shocking is Fred's variance of the terms and requirements of the transactions at will without notice to the petitioners/investors. We give little weight to petitioners' contention that the transaction constitutes a valid sale. Petitioners did not receive the titles to the buses, land or equipment, nor did they try to obtain them. Titles were held in the name of the very partnership purporting to sell them the property and, in the majority of cases, the buses were used with limited useful lives. We are unable to find that this transaction was a valid sale. Petitioners never acquired an interest in the tangible assets. We conclude that although the documents, in form, reflected a sale, in substance and reality no sale took place *430 and petitioners did not acquire an ownership interest upon which deduction or credits were allowable. Petitioners would have us believe that their blind faith in Fred made it unnecessary to question his actions. Petitioners' faith in Fred, however, does not remedy the inadequacies of these transactions. Respondent, by Motion for Determination under Section 6621(c), requests the imposition of an increased rate of interest payable under section 6601 with respect to any substantial underpayment attributable to a tax motivated transaction. Respondent has raised this issue as a new matter in his motion, rather than in the notice of deficiency, therefore, he bears the burden of proof. Rule 142(a). Section 6621(c)[62] provides, in general, that the annual rate of interest shall be 120 percent of the established rate with respect to any substantial underpayment [exceeding $ 1,000] attributable to tax motivated transactions. The increased interest rate, where applicable, applies only with respect to interest accruing after December 31, 1984, even though the transaction was entered into *431 prior to the date of enactment of section 6621(c). Sec. 144(c), Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 682; Stanley Works v. Commissioner,87 T.C. 389 (1986); Solowiejczyk v. Commissioner,85 T.C. 552 (19855), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). The definition of a tax motivated transaction includes "any valuation overstatement (within the meaning of section 6659(c))," sec. 6621(c)(3)(A)(i), as well as "any sham or fraudulent transaction," sec. 6621(c)(3)(A)(v). [63]
*432 Section 6659(c) provides as follows: (c) Valuation Overstatement Defined. -- (1) In General. -- For purposes of this section, there is a valuation overstatement if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be). Respondent has not assessed an addition to tax under section 6659, therefore, we make reference to section 6659(c) merely to determine whether the transactions herein qualify as valuation overstatements for purposes of section 6621(c). In the returns in issue, petitioners claimed adjusted bases in property ranging from $ 18,517 to $ 136,000. Inasmuch as we have determined that the transaction is devoid of economic substance and is to be disregarded for tax purposes, petitioners have no adjusted basis in the tangible assets. Their correct basis is zero. See Zirker v. Commissioner,87 T.C. 970 (1986). Furthermore, we have found that the buses were overvalued by as much as three times *433 the purchase price they were exchanged for in an arm's length transaction which occurred almost simultaneously. Petitioners, therefore, have claimed property values and adjusted bases that exceed the correct value and adjusted bases by more than 150 percent, thus placing each transaction in the statutory valuation overstatement category. Furthermore, because of our determination that the sale-leaseback transaction is devoid of economic substance and is to be disregarded for tax purposes, the "sham or fraudulent transaction" requirement of section 6621(c)(3)(A)(v) also has been met. Patin v. Commissioner,88 T.C. 1086, 1127-1129 (1987). Consequently, respondent has met his burden of proof with respect to section 6621(c). Accordingly, petitioners are liable for additional interest under section 6621(c). Based upon the foregoing, Decisions will be entered for the respondent.
YEAR
DEPRECIATION
REPAIRS
INSURANCE
INTEREST
Paul J. and Amelia Batastini
- #30256-84
1979
$ 4,554.00
$ 2,206.00
$ 1,985.00
$ 611.00
Joel and Vivian Brotman
- #30262-84
1978
$ 6,532.00
$ 5,323.00
$ 5,157.00
$ 4,635.00
1979
4,675.00   5,433.00   4,889.00   4,149.00
TOTALS:
11,207.00  10,756.00  10,046.00   8,784.00
Andrew G. and Dorothy Berenato
- #30332-84
1977
$ 6,611.00
$ 3,158.00
$ 3,504.00
$ 2,500.00
1978
2,611.00   2,884.00   2,794.00   2,237.00
TOTALS 9,222.00   6,042.00   6,298.00 $ 4,737.00
Lawrence and Bonnie Legnola
- #30333-84
1977
$ 8,506.00
$ 5,116.00
$ 5,677.00
$ 4,050.00
1978
4,506.00
4,674.00
4,527.00
3,623.00
1979
4,506.00   4,770.00   4,292.00   3,154.00
TOTALS:
17,518.00  14,560.00  14,496.00  10,827.00
Richard Adamucci - #38659-84
1977
$ 26,624.00
$ 23,193.00
$ 25,735.00
$ 19,945.00
1978
26,369.00  23,014.00  22,296.00  17,843.00
TOTALS:
52,993.00  46,207.00  48,031.00  37,778.00
*434 TIRE AND
FUEL AND
GARAGE
YEAR
LICENSES
TUBES
LUBRICANTS
RENTS
Paul J. and Amelia Batastini
- #30256-84
1979
$ 264.00
379.00
$ 4,164.00
$ 1,614.00
Joel and Vivian Brotman
- #30262-84
1978
$ 839.00
$ 667.00
$ 8,297.00
$ 4,865.00
1979
649.00    933.00  10,254.00   3,976.00
TOTALS:
1,488.00  1,600.00  18,551.00   8,841.00
Andrew G. and Dorothy Berenato
- #30332-84
1977
$ 893.00
$ 409.00
$ 5,013.00
$ 3,609.00
1978
455.00    361.00   4,496.00   2,636.00
TOTALS:  1,348.00    770.00   9,509.00   6,245.00
Lawrence and Bonnie Legnola
- #30333-84
1977
$ 1,446.00
$ 663.00
$ 8,121.00
$ 5,846.00
1978
736.00
585.00
7,283.00
4,271.00
1979
570.00    819.00   9,002.00   3,490.00
TOTALS:
2,752.00  2,067.00  24,406.00  13,607.00
Richard Adamucci - #38659-84
1977
$ 6,557.00
$ 3,006.00
$ 36,813.00
$ 26,502.00
1978
3,268.00  2,881.00  35,868.00  21,032.00
TOTALS:
10,185.00  5,887.00  72,681.00  47,534.00
*435 TOTAL DEDUCTIONS
CLAIMED IN THE
YEAR
SUPERVISION
I.T.C.
APPLICABLE TXBLE YR.
Paul J. and Amelia Batastini
- #30256-84
1979
$   569.00
$ 2,061.00
$ 18,407.00
Joel and Vivian Brotman
- #30262-84
1978
$ 4,012.00
$ 40,327.00
$ 80,654.00
1979
1,401.00   -0-   36,359.00
TOTALS:
5,413.00  40,327.00
$ 117,013.00
Andrew G. and Dorothy Berenato
- #30332-84
1977
$   -0-
$ 2,750.00
$ 28,447.00
1978
2,174.00   -0-   20,648.00
TOTALS:
2,174.00  2,750.00   49,095.00
Lawrence and Bonnie Legnola
- #30333-84
1977
$   -0-
$    -0-
$ 39,425.00
1978
3,522.00
-0-
33,727.00
1979
1,230.00     -0-   31,833.00
TOTALS:
4,752.00     -0-  104,985.00
Richard Adamucci - #38659-84
1977
$   -0-
$    -0-
$ 168,375.00
1978
17,343.00     -0-  170,274.00
TOTALS: 17,343.00     -0-  338,649.00
APPENDIX B [SEE ILLUSTRATION IN ORIGINAL] 1.(a) Bryen Co. borrowed $ 513,533 from Kennedy Co. on or about December 26, 1977. *436 (b) On or about December 26, 1978, Bryen Co. borrowed $ 649,365 from Kennedy Co. (c) At the end of December 1979, Bryen Co. borrowed $ 759,297 from Kennedy Co.
2.(a) By check dated December 22, 1977, Bryen Co., acting as agent for the investors, paid New Pat and Gordon $ 371,517 to cover maintenance expenses and garage rent. (b) Bryen Co. issued check no. 126 in the amount of $ 472,278, dated December 26, 1978, to New Pat and Gordon. (c) Bryen & Bryen, P.A. issued check no. 1634, dated December 31, 1979, to New Pat and Gordon in the amount of $ 550,161.37. On January 4, 1980 this check was returned unpaid due to uncollected funds. It was represented and paid on January 9, 1980.
3.(a) By check dated December 21, 1977, Bryen Co. paid to Kennedy Co. the amount of $ 142,036 to cover the aggregate annual note payments due from all the purported investors. Patgo Associates purportedly assigned and transferred the notes, for face value, to Kennedy Co. by documents dated December 29, 1977. (b) Bryen Co., by check dated December 26, 1978, paid to Motzel and Bernardo the amount of $ 177,087 to cover the aggregate annual note payments due from all the purported investors. *437 Kennedy Co., by documents dated June 30, 1978, and December 26, 1978, allegedly assigned and transferred the notes for face value to Motzel and Bernardo. Motzel and Bernardo were two of the five individuals who owned 60% of Kennedy Co., and who acquired their interest with a $ 1,000,000 bank loan arranged by Bruce. Each of the five was an officer of Kennedy Co. (c) By documents dated January 1, 1979, Motzel and Bernardo, assigned and transferred the notes to Patgo Associates. Fred, acting as agent for Patgo Associates purportedly assigned and transferred these notes, to a company called Kennedy Managers, by documents dated June 30, 1979. Kennedy Managers, by Fred as partner, purportedly assigned and transferred the notes to Kennedy Co. It is unclear from the record if any of the aggregate note installments due in 1979 were paid, and if so, to whom.
4. Rental payments were made by New Pat and Gordon to Patgo Associates pursuant to the Patgo Associates - New Pat and Gordon sublease. Under the terms of this lease New Pat and Gordon was required to pay the same rental amount that was due petitioners/investors under the Investors-Patgo Associates leases, plus 5% override. *438 5.(a) On January 3, 1978, Patgo Associates purportedly paid to Bryen Co., acting as representative of petitioners/investors, $ 513,533. This amount equalled the aggregate amount of rents due to the investors for the 1977 year. (b) Patgo Associates purportedly paid to Bryen Co., on January 8, 1979, $ 649,365. The aggregate amount of rent due to the investors for 1978 was $ 650,365. (c) Fred, on behalf of Patgo Associates, issued a demand note in the amount of $ 759,297, dated January 1, 1980, to Bryen & Bryen, P.A. This amount equalled the aggregate annual rental payment due to the investors for 1979.
6.(a) By checks no. 112 and 113, each dated January 3, 1978, and in the amount of $ 371,517 and $ 150,000, respectively, Bryen Co. repaid the 1977 Kennedy Co. loan. Kennedy Co. charged Bryen Co. $ 7,964 of interest on the $ 513,533 Bryen Co. received in 1977 (1.55%). (b) Bryen Co., by check dated January 2, 1979, repaid the 1978 loan of $ 649,365 obtained from Kennedy Co. Bryen Co. was not charged any interest on this or any subsequent loans. (c) Bryen & Bryen, P.A. issued check no. 1634, dated December 31, 1979, to New Pat and Gordon in the amount of $ 550,161.37. *439 At Fred's direction, New Pat and Gordon endorsed this check to the order of Patgo Associates. Patgo Associates, at Fred's direction, endorsed this check to the order of Kennedy Co. as partial payment of the 1979 loan. The remainder of $ 209,135.63 was paid by checks no. 1632 and 1633 issued by Bryen & Bryen, P.A., each dated December 31, 1979. Footnotes
1. Cases of the following petitioners have been consolidated herewith: Joel and Vivienne Brotman, docket No. 30262-84; Andrew G. and Dorothy Berenato, docket No. 30332-84; Lawrence and Bonnie Legnola, docket No. 30333-84; and Richard Adamucci, docket No. 38659-84. ↩
2. Appendix A lists the deductions and credits taken by each petitioner. ↩
3. There is an additional issue in docket No. 30262-84 involving the disallowance of medical expenses in the amounts of $ 8645 and $ 110 for taxable years 1978 and 1979, respectively. ↩
4. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. Sec. 6621(d) was redesignated subsection (c) and amended by sec. 1511(c)(1)(A)-(c), Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2744. The reference to this section is herein used to the Internal Revenue Code as redesignated and amended. All rule references are to the Tax Court's Rules of Practice and Procedure. ↩
5. Bryen & Bryen, P.A., was owned as follows: Shares
%
Fred Bryen
100
50
Bruce Bryen
100
50
200
100↩
6. Prior to forming Bryen & Bryen, P.A., Bryen, Bryen and Co. was a management and accounting firm. After the incorporation of Bryen & Bryen, P.A., the original firm performed the management activity and the corporation performed the accounting. ↩
7. Ninety-eight or ninety-nine percent of Old Pat and Gordon's business was from school bus activity and the remainder was from charter work. The school bus business was based upon an annual contractual relationship with the local school district. ↩
8. Patgo, Inc., was formed for the purpose of negotiating the purchase of the tangible assets of Old Pat and Gordon, Inc. Patgo, Inc., was incorporated under the laws of New Jersey on Jan. 1, 1977. ↩
9. Under the terms of this agreement the parties allocated $ 104,202 of the purchase price to the land and buildings and the remainder to buses. Angelo Poponi (Poponi) was the principal shareholder of Old Pat and Gordon. As part of the sale, Poponi was to receive a lump sum fee of $ 925,000 payable in equal installments over five years and Poponi's management company was to receive five percent of the gross sales in excess of $ 892,000 as commissions for five years. The $ 925,000 plus five percent were guaranteed payments notwithstanding the possible termination of the management contract or any other contingency. ↩
10. The capital stock of both Patgo, Inc., and 5 Allison Drive, Inc. (New Pat and Gordon), was owned as follows: Shares
%
William Bryen
62.5 6.25
Andrew Bryen
62.5 6.25
Bruce Bryen
125.00
12.50
Richard Adamucci
250.00
25.00
Anthony Bucci
125.00
12.50
Joseph Ingemi
125.00
12.50
John Rizzotte
125.00
12.50
Joseph Cacia
125.00
12.50↩
1,000.00
100.00
11. The $ 70,000 purchase price was allocated as follows: (a) Right to use the name "Pat and Gordon, Inc.," $ 10,000 (b) Covenant not to compete $ 10,000 (c) Contracts $ 40,000 (d) P.U.C. license $ 10,000 ↩
12. New Pat and Gordon was, and remained during the years in issue, a wholly owned subsidiary of Patgo, Inc. ↩
13. The parties provided no explanation for this mortgage and the value of the collateral given. No copy of the mortgage deed or other pertinent documents were submitted into evidence. We, therefore, draw no inferences about the value of the Lawnside real property from this transaction. ↩
14. The total purchase price of $ 628,200 was allocated to the assets as follows: 77 Buses
$ 446,300
4 Service vehicles
16,600
Land, Building, and
Equipment
165,300↩
$ 628,200
15. Bruce testified that he determined the amount of money each investor was to invest, presumably, to maximize the tax benefit each investor wished to obtain given his particular income situation. ↩
16. At trial, each petitioner testified that Bruce told them that there was a possibility they could double their money in the investment. They were, however, unsure as to how this would happen and how they could expect to obtain this. Petitioners did not request or demand an explanation of the proposed profit potential or inquire about the method or factual basis for the projected profits. Fred, who had no firm plan to accomplish a two-to-one return on investors deposits, elusively described the "planning" as follows: The deal, as I structured it, based on the original idea, which we have long since discarded, was supposed to return to the investor double his money. Starting the eighth year, he was supposed to get one-seventh of double his money if it was there to give him. ↩
17. Petitioners' tax returns and all attachments were prepared by Bryen & Bryen, P.A., i.e., either by Bruce or Fred. ↩
18. A document captioned "Bill of Sale" was executed by Patgo Associates in favor of each investor. Each "Bill of Sale" purported to transfer ownership of the property listed in the "Sales Contract" from Patgo Associates to the investor. The "Bill of Sale," however, also provides that Patgo Associates is the lawful owner of the property free and clear from all encumbrances. ↩
19. See deductions taken by petitioner Adamucci set forth in Appendix A. ↩
20. Fred Bryen was primarily responsible for implementing the management agreements entered into by Bryen Co. and each investor. ↩
21. Fred testified that as far as he was concerned, "We would be renewing those leases in one form or another over the life of the bus." Each lease agreement provides in pertinent part: 5. Maintenance of School Buses.
A. The Lessor shall, at its own expense, supply the fuel, lubricating oil, tires, repair parts and all other items and labor (except drivers) needed to operate the Equipment and to maintain it in good operating condition during the term of this lease. C. The Lessor assumes all responsibility and the cost and expense for all licensing, registrations, permits and such other certificates as may be required for the lawful operation of the Equipment. All certificates of title or registration applicable to the Equipment shall be applied for, issued and maintained in the name of the Lessor or his nominee as owner, and the Lessor shall pay all costs in relation thereto. 6. Lessor's Inspection. Lessor shall at any and all times during business hours have the right to enter into and upon the premises for the purpose of inspecting the same or observing its use. Lessee shall give Lessor immediate notice of any attachment or other judicial process affecting any item of Equipment and shall, whenever requested by Lessor, advise Lessor of the exact location of the Equipment. 8. Insurance.
B. The Lessee shall indemnify and shall hold harmless the Lessor from all loss and damage the Lessor may sustain or suffer by reason of the death or injury to the person or property of any third person as a result, in whole or in part, of the use of the Equipment during the term of this lease; and the Lessee shall procure, at the Lessor's cost and expense, a policy or policies of insurance issued by a company satisfactory to the Lessor with premiums prepaid thereon, insuring the Lessee against the risks and hazards specified in minimum amounts of $ 300,000/$ 500,000 personal damage liability. ↩
22. This agreement was executed by Bruce Bryen acting on the behalf of Bryen Co., and Fred Bryen acting on the behalf of Patgo Associates. ↩
23. An alleged oral agreement was entered into by Patgo Associates and New Pat and Gordon which required New Pat and Gordon to provide all the bus maintenance. The agreement did not cover drivers. New Pat and Gordon provided this service to the investors for a fee. ↩
24. The annual lease payments for buses allegedly acquired by investors in 1977 and 1978 were set by Fred at 80 percent of their "cost" and for buses allegedly acquired in 1979 at 70 percent of "cost." In 1983 Fred unilaterally reduced the lease payments for 1984 and thereafter to 40 percent of "cost" for the buses allegedly acquired in 1977, 45 percent for buses allegedly acquired in 1978, and 49 percent for buses allegedly acquired in 1979. Fred testified that he reduced the payments for years commencing Jan. 3, 1984, because the investors were "making too much money." ↩
25. A P.U.C. bus differs from a standard school bus (non-P.U.C. bus) as follows: (1) The roof is higher giving more head room, (2) the seating is arranged two-by-two for each seat, (3) there is a protective shield behind the driver made with stanchions and a sheet of plastic, and (4) the spacing between the seats is different. ↩
26. Five of the 77 buses purchased by Patgo, Inc., retained P.U.C. designation. They were among the buses assigned to Richard Adamucci as part of his investment. ↩
27. Batastini, an orthodontist for approximately 13 years, testified at trial that he invested in the activity mainly because of the tax benefits. His memory was vague about what Bruce said to him when they met to discuss the investment. ↩
28. The "Sales Contract" provided that title to the vehicles would be held in the name of Patgo, Inc., for purposes of facilitating registration of the vehicles. The contract further provided that Patgo Associates shall retain possession of the titles to secure payment and performance of the investor's obligation. Under the terms of this contract the investors agreed not to encumber, sell, create a security interest in, or otherwise transfer or dispose of any interest in the collateral without the prior written consent of Patgo Associates. ↩
29. The management functions of Bryen Co. as provided in the investor-Bryen Co. management agreement were orally assigned to Bryen & Bryen, P.A., without the notification or consent of the investors. ↩
30. None of the petitioners were notified of any lease renewal or of the terms and conditions of the lease. ↩
31. Petitioner Brotman was a mortgage banker and at the time of trial had been in the mortgage banking business for approximately 16 years. He was an employee of Kennedy Mortgage Co. ↩
32. Brotman testified that he did not know what the $ 25,000 would be used for. This amount was paid with a note executed by petitioner and paid by Kennedy Co. Petitioner testified that the funds from Kennedy Co. that were used to pay his cash outlay represented commissions Kennedy Co. owed him. ↩
33. Berenato is a building contractor and at the time of trial had been in the construction business for 30 years. He was introduced to the investment sometime late in 1976. ↩
34. Petitioner paid his total investment with two checks, one of which was dated May 17, 1978, in the amount of $ 6,542.78. It is unclear if a part of this payment is attributable to interest resulting from the late payment. ↩
35. The documents by which petitioner purportedly purchased and leased back buses were in reality signed no earlier than Nov. 11, 1978. ↩
36. The "Addendum to Lease Agreement" was executed by Bruce acting on behalf of both Patgo Associates and petitioner. ↩
37. The "Addendum to Lease Agreement" extended the lease for two buses manufactured in 1975 and 1976 for one and two years, beyond their respective useful lives. ↩
38. Legnola is a residential builder and at the time of trial had been engaged in that activity for approximately 15 years. He was introduced to the investment sometime late in 1976. ↩
39. All documents signed by Legnola were dated Jan. 3, 1977, but may have been signed as late as Aug. 18, 1977. At trial petitioner could not testify that these documents were in fact signed on Jan. 3, 1977. ↩
40. We note that under the lease agreement total rent was $ 45,562.50, however, the three equal payments of $ 8,316, as provided for in the agreement, equals only $ 24,948. Furthermore, the rental amount called for in the "Lease Agreement," varied from the amount reported on Legnola's 1978 and 1979 income tax returns. Both returns were prepared by Bryen & Bryen, P.A. ↩
41. The "Addendum to Lease Agreement" was executed by Bruce acting on the behalf of both Patgo Associates and petitioner. ↩
42. The "Addendum to Lease Agreement" extended the lease for the three buses manufactured in 1975 for a period two years beyond their useful life, and for one bus manufactured in 1976 for a period one year beyond its useful life. ↩
43. Petitioner Adumucci is the sole shareholder of Adamucci Oil Company, a distributor of petroleum products, and at the time of trial had been involved in the oil business since 1960. Adamucci was introduced to the sale-leaseback activity sometime in the summer of 1976. ↩
44. The documents were signed by petitioner no earlier than Mar. 24, 1977. ↩
45. The "Addendum to Lease Agreement" between Patgo Associates and petitioner extended the lease for the five 1972 buses, two of the 1973 buses, and the five 1974 buses, five, four, and three years, respectively, beyond their useful lives. ↩
46. Theresa Adamucci, mother of petitioner Richard Adamucci, testified that trial that she knew nothing about the investment or of her alleged involvement. ↩
47. All documents related to transactions assigned to Theresa were executed by Richard Adamucci pursuant to an oral power of attorney Richard claimed to be held by him. ↩
48. Fred intended to lease the Lawnside real property to the investors for ten years on successive year-to-year leases and at the end of this period have the property repurchased by New Pat and Gordon. ↩
49. By an unacknowledged and unrecorded deed, dated January 1, 1980, and executed by Theresa, the Lawnside real property was purportedly transferred, at Fred's direction, to Adamucci Associates (a partnership in which Theresa was a partner) for $ 123,615. By an unacknowledged and unrecorded deed executed by Richard Adamucci (partner of Adamucci Associates), dated Dec. 31, 1984, Adamucci Associates then purportedly transferred the Lawnside real property to New Pat and Gordon for $ 200,000. ↩
50. See Appendix B for total loans obtained from Kennedy Mortgage Company and the expenditure of these funds. ↩
51. At the end of each year in issue New Pat and Gordon would accrue on its books $ 73,689 for garage rent and charge the same amount to the investors' account, thereby creating a receivable due to Net Pat and Gordon from the investors. This amount, however, was never paid over to Theresa. ↩
52. Patgo Associates, by documents dated Dec. 29, 1977, purportedly transferred to Kennedy Co., for face value, all the installment notes executed by the petitioners. By documents dated June 30, 1978, Kennedy Co. purportedly assigned and transferred, for face value, petitioners' installment notes to Motzel and Berenato. These notes were purportedly assigned and transferred to Patgo Associates from Motzel and Berenato by documents dated Jan. 1, 1979. ↩
53. In 1977 Kennedy Co. was owned as follows: Shares
%
William Bryen (Fred's brother)
237.50
7
Andrew Bryen (Fred's brother)
237.50
7
Bruce Bryen
237.50
7
Richard Adamucci
312.50
9
Anthony Bucci
156.25
5
Ingemi
156.25
5
1,337.50 * 40
* The remaining 60 percent was owned by Thomas A. Martin, Robert Motzel, Berenato, H. Eugene Brown and Zinman, the officers of Kennedy Co. The owners of this 60-percent interest acquired their shares with $ 1,000,000 loan proceeds that were arranged by Bruce. The remaining 60 percent continued to be owned by Martin, Motzel, Berenato, Brown and Zinman. In 1978 Kennedy Co. was owned as follows: Shares
%
William and Andrew Bryen
1,312.50
21
Richard Adamucci
512.50
9
Anthony Bucci
256.25
5
Ingemi
256.25
5
2,337.50
40
In 1979 Bryen & Bryen, P.A., purchased the shares owned by Richard Adamucci, Anthony Bucci and Ingemi. Additionally, Fred and Bruce purchased 437.5 of the shares held by William and Andrew Bryen. Consequently, in 1979 Kennedy Co. was owned as follows: Shares
%
William & Andrew Bryen
875.00
15
Bruce Bryen
218.75
3
Fred Bryen
218.75
3
Bryen & Bryen, P.A.
1,025.00
19
2,337.50
40
The remaining 60 percent continued to be owned by Martin, Motzel, Berenato, Brown and Zinman. ↩
54. Kennedy Co. charged Bryen Co. $ 7,964 in interest on the 1977 loan of $ 513,533 (1.5 percent). At trial Fred could not remember whether Patgo Associates or Bryen Co. bore this expense. ↩
55. Fred represented both New Pat and Gordon and Bryen Co. with respect to negotiating the amount, if any, Bryen Co. should charge New Pat and Gordon for supervision. In some cases Fred decided, unilaterally, not to charge any supervision fees. ↩
56. We treat all of these entities as one because they were owned and controlled by a common group. The existence and need for all these entities, has to a great extent, been left to our imagination. We could speculate that some may have been for pure purposes of segregating the assets, providing the shareholders with limited liability, and to effect the inflated basis of the property. ↩
57. Although split up between different entities, the total amount paid to effect the buy out of Poponi was $ 1,254,500, plus five percent of any gross sales exceeding $ 892,000 annually, for five years. Petitioners have provided no explanation for their allocation of the purchase price. One would expect that the allocations were negotiated between Poponi and the purchasers and that ability to pay, tax benefits, and business needs and conditions were relevant in determining the final terms. There is insufficient evidence in this record, however, to be able to determine whether the original allocation of the purchase price does not fairly represent the fair market value of the buses and realty. Petitioners have not shown the original transaction with Poponi to be anything less than arm's length and, accordingly, we are left with no explanation of the increase in basis or value of the buses simply by their purported movement through other entities. ↩
58. The two-for-one return was structured so that investors received most, if not all, of their return up front by means of the investment tax credit, deductions and a built-in one-year deferral or lag time in reporting the income with further emphasized the first year deductions. Presumably, the investors were to receive cash payments on their investment in later years from excess rental income facilitated by the conclusion of the five-year buy out of Poponi. Interestingly, when this excess rental income began to be generated, Fred though it was too generous for the petitioners/investors and he arbitrarily reduced the rental payments due to the petitioners/investors without consulting or advising them. ↩
59. Buses were indiscriminately assigned the same value, without relation to their original cost, age, condition or remaining useful life under state law. Lease agreements were purportedly in effect without negotiation, written documents or any contact with the alleged owner of the realty. Income and deductions were allocated to buses that were nonoperative because their useful life had expired. Moreover, loans were obtained from an institution (partly owned by Bryen interests and by some of petitioners herein) for short periods of time, without any or nominal interest (1.5 percent) being charged. The borrowed funds were used in a money circle to pay rent, operating expenses, installments and interest due on the notes, and then returned to the lender in about ten days. ↩
60. This Byzantine maze of tax shelter "plumbing" appears, in essence, to be nothing more than a buy out of Poponi's school bus business, by the "Patgo group," with profits generated by their newly acquired bus business. Petitioners' involvement, at very best, could be characterized as lending capital to the buyers in exchange for current tax benefits in the form of deductions and investment tax credits (a financing transaction). These tax benefits would be petitioners' compensation for the use of their money. The benefits and burdens of ownership of the property involved, however, was not transferred to petitioners/investors. ↩
61. The term "money circle" is intended to mean that the funds were cycled through the parties "hands" merely to provide evidence of payment for tax purposes. Normally the funds were used for a short period (week to ten days) and returned to the lender. ↩
62. Sec. 6621(c) provides, in pertinent part, as follows: (c) Interest on Substantial Underpayments Attributable to Tax Motivated Transactions. -- (1) In general. -- In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the annual rate of interest established under this section shall be 120 percent of the underpayment rate established under this subsection. (2) Substantial underpayment attributable to tax motivated transactions. -- For purposes of this subsection, the term "substantial underpayment attributable to tax motivated transactions" means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $ 1,000. ↩
63. Sec. 6621(c)(3) provides, in pertinent part, as follows: (3) Tax motivated transaction. -- (A) In general. -- For purposes of this subsection, the term "tax motivated transactions" means -- (i) any valuation overstatement (within the meaning of section 6659(c)), (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8), (iii) any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092), (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period, and (v) any sham or fraudulent transaction.↩